IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No.: 1:25CR280 |
| | ) | Hon. Michael S. Nachmanoff |
| EMMANUEL AGYEI GYASI, | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S POSITION ON SENTENCING**

Comes now, Emmanuel Gyasi, by counsel, and states his position regarding sentencing. Mr. Gyasi has reviewed the Presentence Report ("PSR") and has two objections to the report regarding the calculation of the guidelines. Specifically, Mr. Gyasi objects to (A) the two-level enhancement applied pursuant to USSG § 2B1.1(b)(2)(A)(iii)) ("substantial financial hardship to one or more victims.");[1] and (B) the probation officer's withholding of a two-level decrease pursuant to USSG § 4C1.1(a) (adjustment for certain Zero-Point Offenders). As explained in greater detail *infra*, should the Court sustain the objection, the corrected guideline calculation would yield an advisory range of 21-27 months (based on a Total Offense Level 16 and Criminal History Category I).

Notwithstanding the guidelines, and for the reasons articulated below, Mr. Gyasi requests that the Court impose a lengthy term of home confinement, and *if* the Court deems necessary – a modest term of imprisonment, a 3-year term of supervised release, and full restitution. Such a sentence is sufficient to address the factors enumerated in 18 U.S.C. § 3553(a).

---

[1] *See* PSR ¶ 46.

1

**Statement of Charge and Procedural History**

Prosecution in this case was initiated by Criminal Complaint, filed July 17, 2025, charging Mr. Gyasi with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). An arrest warrant was subsequently issued. (The charge stemmed from Mr. Gyasi's conduct three years earlier, in 2022.) On July 28, 2025, the arrest warrant was executed where Mr. Gyasi resides in the Northern District of Illinois. Appearing before a magistrate judge that same day, Mr. Gyasi waived his identity and preliminary hearings and was released with conditions, including a $4,500 unsecured bond.

Mr. Gyasi was cooperative with federal agents in the prosecution of his own misconduct and expressed his desire to accept responsibility early in the process. In August, the government filed a Consent Motion to Extend the Deadline for Indictment. (ECF Doc. 16.) The parties negotiated and reached an agreement that called for Mr. Gyasi's guilty plea to a single count charging him with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. 1349. On October 9, 2025, a Grand Jury sitting in the Eastern District of Virginia returned the one count Indictment.

On October 30, 2025, Mr. Gyasi travelled from his home in Illinois to the Eastern District of Virginia where he pled guilty to the Indictment as charged. Sentencing was scheduled for March 5, 2026, pending completion of a presentence report.

## I.

## OBJECTION TO THE CALCULATED GUIDELINES

Mr. Gyasi objects to the guidelines in two respects. Both issues raised by the defense turn on whether the government's evidence supports a finding of "substantial financial hardship" suffered by the victim. Mr. Gyasi submits that it does not.

2

The government bears the burden of establishing the applicability of an increase in offense level under the sentencing guidelines, while the defendant carries "the burden of showing entitlement to any reduction." *United States v. Abdi*, 342 F.3d 313, 317 (4th Cir.), *cert. denied*, 540 U.S. 1167 (2003), *citing United States v. Solomon*, 274 F.3d 825, 828 n.2 (4th Cir. 2001).

To determine whether "substantial financial hardship" occurred, the court is to consider factors such as whether the victim became insolvent, filed for bankruptcy, suffered *substantial* loss of retirement or other savings or investment fund, made substantial changes to employment or retirement plans, made substantial changes to living arrangements, or suffered substantial harm to his ability to obtain credit.    (USSG 2B1.1, comment. n.4(F)).    The Seventh Circuit has characterized the evaluation of substantial hardship as a "measure of relativity," explaining that the operative inquiry into substantial hardship is "gauged relative to each victim." *United States v. Minhas*, 850 F.3d 873 (7th Cir. 2017) (affirming a four-level increase under 2B1.1(b)(2) based on victims' individual losses and economic circumstances); *accord United States v. Poulson*, 871 F.3d 261, 269 (3rd Cir. 2017);  *United States v. Hanson*, 124 F.4th 1013, 1018, *citing Minhas* ("financial hardship is to be gauged relative to each victim."); *United States v. Skouteris,* 51 F.4th 658, 672 (6th Cir. 2022) (internal citation omitted) (the enhancement focuses on the "extent of the harm" to a particular victim and requires a showing that the loss was "more than minimal or trivial" as gauged by the victim's specific financial circumstances.); *United States v. George*, 949 F.3d 1181, 1185, (9th Cir. 2020) quoting *Minhas* ("whether a loss has resulted in a substantial hardship…will, in most cases, be gauged relative to each victim," and "[t]he same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup."); *United States v. Sutton*, 2024 U.S. App. LEXIS 18479(10th Cir. 2024)

3

(*unpublished*)(same).

As the Ninth Circuit, in *George*, recognized:

> [b]y including "substantial" before "financial hardship," the provision excludes minor or inconsequential financial harms. That conclusion is supported by the noun "hardship," which itself suggests something more than a mere inconvenience. *See* Webster's Third New International Dictionary 1033 (1993) ("suffering, privation"). In other words, to be substantial, the victim's financial hardship must be significant.

*George*, at 1185.

Mr. Gyasi wishes to make clear that he recognizes his victimization of B.B. was wrong and that stealing any amount of another's hard-earned money is unacceptable for any reason. The defense' arguments regarding the nature and quantum of evidence necessary to support a finding of **substantial** financial hardship in this case in no way suggest that the victim and his family were not harmed or that those with greater financial fortune deserve less protection. In the context of USSG 4C1.1 (Zero-Point Offender), the issue is one which balances Mr. Gyasi's lack of prior unlawful conduct and the non-violent nature of the instant offense against the "degree of financial harm" suffered by the victim.

As an initial matter, the defense first received the victim's impact statement when it was provided by the probation officer as part of the *final* PSR. The information provided by the government prior to receipt of the "draft" PSR was merely that the victim reported having postponed his retirement (period unspecified). A victim "[m]aking substantial changes to his or her employment, such as postponing retirement plans" is but one of six factors to be considered by the Court in analyzing the issue. *See* § 2B1.1, comment. n.4(F).

Here, "B.B." expressed that the money that he was defrauded "represented a substantial

4

portion" of his savings.  However, the Court must make an independent determination as to whether the financial hardship suffered was "substantial" and – respectfully - the subjective opinion of the victim (who – understandably -may be biased) provides an insufficient basis for assessment.

It is not defense counsel's position that an objective determination by this Court requires a full disclosure of the victim's assets.  However, *some* additional information is required to permit the Court to make the necessary comparison.  A loss amount of $850,000 would be devastating for a sixty-year-old, earning $100,000 per year, who spent decades saving for retirement and whose portfolio was even double the amount stolen.  Conversely, the same loss might be less "substantial" for a 60-year-old earning $850,000 per year, who had faithfully saved 20% of their annual salary for the last twenty years.  Even with sufficient information, there remains a bit of subjectivity when it comes to defining what it means to be "substantial."  "*Substantial*" is a term of relativity, requiring a comparison of at least two things.  The Court has *in*sufficient information to make the required determination, and since the government has the burden of establishing applicability of guideline enhancements that raise the offense level, this Court must sustain the objection.

## II.
## POSITION REGARDING SENTENCING PURSUANT TO 18 U.S.C. § 3553(a).

**Legal Authority**

After *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are advisory, and the court of appeals reviews sentences for reasonableness.  *See United States v. Hughes*, 401 F.3d 540, 546-47 (4th Cir. 2005).  In *Rita v. United States,* 127 S.Ct. 2456 (2007), the Supreme Court stated that a district court should begin all sentencing proceedings by correctly

calculating the applicable Guideline range. The Guidelines are not the only consideration, however. The district court must then consider all the factors listed in § 3553(a) and determine if they support the sentence requested by a party. The approach to sentencing must be a comprehensive one in which the Court fashions a sentence that is sufficient but not greater than necessary to meet the requirements of 18 U.S.C. § 3553.

Although sentencing courts must continue to consider the Guidelines, Congress has *required* federal courts to impose the least amount of imprisonment necessary to account for the considerations and accomplish the sentencing purposes set forth in 18 U.S.C. § 3553(a). These include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory Guidelines range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment and adequate deterrence, and protect the public from future crimes by the defendant. Additionally, the sentence should provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a); *see also Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). There is no limitation concerning the background, character, and conduct of a person convicted of an offense that a court may receive and consider for the purpose of imposing an appropriate sentence. 18 U.S.C. § 3661.

**Analysis pursuant to 18 U.S.C. § 3553(a)**

A. *Nature of the Offense*

The facts, as laid out in the Statement of Facts, accurately reflect Mr. Gyasi's conduct and role in the instant offense. Mr. Gyasi conspired with others to commit wire Fraud. His course of

6

conduct contributed to the victim's loss of $850,000 (spread over four separate wire transfers). The wire transactions occurred between June 3, 2022, and June 27, 2022. Mr. Gyasi opened two bank accounts that were subsequently used to receive bank wires from the victim. Mr. Gyasi in turn transferred the funds to other bank accounts controlled by his co-conspirators.

Mr. Gyasi was not the mastermind behind the instant scheme. His involvement with the other individuals who participated in the scheme began innocently enough. Mr. Gyasi had dreams of entrepreneurship, sought to build a business, Pukka Auto LLC, that purchased and restored low-cost vehicles in need of repair for resale. He was lured into what eventually became the instant offense by an individual(s) who initially promised that they could (legitimately) help him establish and grow a successful business here in the United States and via expansion to Ghana.[2] Mr. Gyasi was excited by the opportunity presented, so he plowed forward  - even after it became clear to him that his partner(s)' intentions were unpure.

Mr. Gyasi makes no excuses for his behavior. He is genuinely remorseful for his actions and involvement in this matter. He holds himself accountable and knows that there will be severe consequences for his actions. A felony conviction, loss of civil rights, years of restricted liberty while on federal supervision, forfeiture of fraudulent proceeds, payment of restitution, a period of home confinement, and – if the Court deems necessary – a modest term of imprisonment -  is sufficient to reflect the nature and seriousness of the instant offense.

B. *History and Characteristics of Emmanuel Gyasi*

An individual is more than his greatest transgression and the attached letters, provided by

---

[2] One of the individuals claimed that he shared business interests (and dealings) similar to Mr. Gyasi's. Mr. Gyasi consented to the use of his business banking account by his co-conspirators -even after he became aware that the funds involved were from ill-gotten gain.

those who know him far better reveal someone known for their thoughtful nature, generosity of time and labor, and acts of kindness. Mr. Gyasi's extremely poor decision to participate in this criminal scheme is in stark contrast to the reputation he has earned in his community of neighbors, colleagues, friends, and family.

The attributes identified that will serve Mr. Gyasi best as it relates to the instant conviction, punishment, and obligation (to the Court) over the next several years are his resilience, humility, and strong work ethic. Mr. Gyasi's humility has allowed him to re-evaluate - in light of his criminal conduct - the values that he says he holds dear. For the better part of the past year, as the prosecution loomed, Mr. Gyasi has been conducting an honest, ongoing, inventory of who he is; who he wants to be to his community; and what it will take to regain the trust that he violated by his actions.

Coupled with his strong work ethic, his humility will drive him to take on multiple jobs (some which may be menial) to repay the victim using the bulk of his earnings while supporting himself with whatever modest amount remains. This is no cry for sympathy, rather it is what Mr. Gyasi sees as "moral obligation" flowing from his prior unlawful conduct.

Mr. Gyasi has a strong work ethic. As reflected in the PSR, he came to the United States at 14 years old and began working as a technical engineer at his father's church that same year. He maintained that position for two years. Since turning 18 years old, he has been regularly employed. His employment history also demonstrates that he is willing to accept employment across varying disciplines.[3]

Finally, Mr. Gyasi is described as someone who is resilient. People who are resilient often

---

[3] *See* PSR ¶¶ 74- 79.

possess mental and emotional toughness that allows them to adapt to adversity, manage stress in a positive manner, and bounce back from challenges. Mr. Gyasi has not "lived the American dream" as the government declares in its position paper. ECF Doc. 38 (Govt's Position at 7). When he came to the United States with his sister at 14 years old, he was one of six family members living in a two-bedroom apartment. He received love, but financial resources were often spread thin.[4] (Mr. Gyasi immediately began working as a technical engineer at the church.[5]) And though he spoke English, there was still a significant learning curve mastering the language, navigating as an immigrant *and teenager* in an urban city in America; and adapting socially. Mr. Gyasi has faced - and overcome many obstacles along the way due in part to his focus, proactive problem-solving mindset, and determination.

As the attached letters demonstrate, Mr. Gyasi has a strong social support network who is now aware of his short-coming and legal predicament. Their continued presence serves the dual purpose of holding Mr. Gyasi accountable while also encouraging his success. *"He possesses the discipline, humility, and determination necessary to grow from this situation and prove himself worthy of the Court's trust."* *See* Letter from Kwesi Poku, attached.

Presence of Extraordinary Family Ties and Responsibility

Mr. Gyasi's extraordinary family ties and responsibilities is also a factor the Court can and should consider when fashioning an appropriate sentence in this case.[6] As referenced in the PSR

---

[4] His father was employed as a security guard.

[5] It is unclear whether he received financial compensation.

[6] Although the 2025 USSC Guideline Amendments eliminated departures pursuant to Chapter 5, Part H ("Specific Offender Characteristics"), including departure based on extraordinary family ties, the relevance of family ties remains and the rationale for considering the factor is still reflected in Appendix B, Part III ("Compilation of Deleted Departure Provisions"). The existence of extraordinary family responsibilities remains a factor pursuant to 18 U.S.C. §§ 3553(a) and 3661.

9

and several of the letters addressed to the Court, Mr. Gyasi's father previously suffered a spinal cord injury which limits his mobility. *See* PSR ¶ 63. His father also has problems with his vision. *Id.* Mr. Gyasi's father lives alone and has no family – outside of Mr. Gyasi – to assist with his care.[7] Mr. Gyasi plays an integral role in his father's weekly maintenance and care. In a letter to the Court, Mr. Gyasi's college friend recounted how throughout their collegiate experience, Mr. Gyasi would routinely travel 90 – 120 minutes roundtrip back to his hometown to take his father to medical appointments, run errands, or perform needed tasks inside his home (such as moving furniture). *See* letter from Ron Cann, (attached). Mr. Gyasi requests that in determining an appropriate sentence, the Court consider the hardship that a lengthy term of imprisonment would have upon his father's health, well-being, and overall quality of life.

Mr. Gyasi's Youth at the Time of His Offense is a Mitigating Factor in this Case.

The Sentencing Commission has recognized that youthful individuals are generally more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into adulthood (which they refer to as mid-20's). USSG Amendment 829 (Nov. 1, 2024). In explaining the need for the amendment, the Commission wrote:

> In line with the Commission's statutory duty to establish sentencing policies that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process," 28 U.S.C. § 991(b)(1)(C), this amendment reflects the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability. The amendment also reflects expert testimony to the Commission indicating that certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate

---

[7] Mr. Gyasi's parent divorced when he was young, and his paternal siblings live in North Carolina, Florida, and Minnesota. PSR ¶ 63.

10

interventions, may promote desistance from crime.

*Id*.

The conduct that brings Mr. Gyasi before this Court occurred in 2022, when Mr. Gyasi was 24 years old.   As a young adult in 2022, Mr. Gyasi fell within a category of individuals aged 18 to 24 who "stand out as a distinct developmental group with heightened impulsive behavior, risk taking, and poor decision making" because "significant brain development is still occurring and decision-making abilities are not fully mature."[8]

A quote from the Massachusetts Institute of Technology's ("MIT") Young Adult Development Project sums it up perfectly – "'…the rental car companies have it right.'  The brain isn't fully mature at 16, when we are allowed to drive, or at 18, when we are allowed to vote, or at 21, when we are allowed to drink, but closer to 25, when we are allowed to rent a car."[9]  A young or "emerging" adult is more likely to engage in impulsive, risky behavior and less likely to consider the future consequences of his/her actions.  *Id*.

The criminal justice system has traditionally viewed youthful offenders more differently than adult offenders.  "[Y]outh is more than a chronological fact.  It is a time and condition of life when a person may be most susceptible to influence and to psychological damage."[10]  Part of the reason that youthful offenders are treated differently than adults is based in part on the unformed

---

[8] The Council of State Governments Justice Center, *Reducing Recidivism and Improving Other Outcomes for Young Adults in the Juvenile and Adult Criminal Justice Systems* (New York:  The Council of State Governments Justice Center, 2015).

[9] MIT Young Adult Development Project, Brain Changes, A. Rae Simpson, 2008, http://hrweb.mit.edu/worklife/youngadult/about.html.

[10] *See Gall v. United States*, 552 U.S. 38 (2007); *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)).

11

nature of the adolescent brain. *See, e.g.*, National Institute of Health Publication 4929, *The Teenage Brain: A Work in Progress* (2008).

Mr. Gyasi's conduct certainly makes the case for how easily influenced young adults are to outside pressures or coercion. Mr. Gyasi had no criminal history prior to the instant offense. In fact, during his academic years, Mr. Gyasi was an outgoing student who made friends easily and had a reputation for being positive, helpful to others, and thoughtful. He graduated college with a 2.22 GPA and a degree in public health. His behavior four years ago clearly represents the actions of someone who had not yet matured or acquired the judgment and rationale that accompany adulthood.

Certain characteristics of the instant offense scheme demonstrate Mr. Gyasi's youthful vulnerability and cognitive maturity deficit. For Mr. Gyasi's part, the plan was not at all complicated or sophisticated. He allowed his bank account to be used by co-conspirators as a repository for funds that represented proceeds of a scheme to defraud. The co-conspirators provided the victim with the account information and directed the victim to wire the funds. Mr. Gyasi then transferred those funds to various accounts held by co-conspirators and others. Mr. Gyasi did not employ any measures to conceal his identity, his nexus to any bank accounts, or his location (e.g., his true name, home address, email information, etc. were available as part of the banking documents). Mr. Gyasi took all the risks, received a minuscule share of the proceeds, and bears the responsibility of repaying one hundred percent of the loss sustained by the victim. The lack of sophistication involved, the heightened probability of detection, Mr. Gyasi's naivety in using his true identifiers, and his failure to incredible imbalance between risk and reward exemplifies his immaturity and decreased culpability.

12

Mr. Gyasi is also the only involved individual living inside the United States and the only individual who is subject to prosecution in this offense. Despite his offer to provide federal authorities with what information he has regarding the identity, location, and/or role of other conspirators, the government has expressed a lack of interest due to those individuals presence beyond U.S. borders.

Nonetheless, Mr. Gyasi must be held accountable for his own conduct, whether or not it was influenced by others, and he is prepared to accept whatever punishment the Court imposes at sentencing. A felony conviction, loss of civil rights, years of restricted liberty while on federal supervision, forfeiture of fraudulent proceeds, payment of restitution, and a period of home confinement is sufficient to reflect the Mr. Gyasi's unique history and characteristics.

### C. Retribution, Deterrence, Incapacitation, Rehabilitation

The sentencing statute directs the Court to impose a sentence that is minimally sufficient to comply with the purposes of sentencing listed in paragraph § 3553(a)(2), frequently referred to in shortcut form as punishment, deterrence, incapacitation, and rehabilitation. More simply stated, this Court must impose the *least restrictive* sentence sufficient to address these sentencing goals.

Collateral Consequences

The guidelines fail to consider the role that collateral consequences can play in achieving sentencing goals related to punishment, deterrence, and protecting the public from future crime committed by a defendant.

- Decreased likelihood of obtaining employment in his degreed field (public health);
- Reduced earning potential;
- Forfeiture of proceeds from tax returns, lottery winnings, or other resources;

13

- Loss of voting rights, especially during a time fraught with uncertainty;

- Social stigma associated with one's status as a felon; and

- Restrictions on housing and/or housing discrimination.

These are but a few additional consequences resulting from Mr. Gyasi's conviction, but not otherwise accounted for by the guidelines. These consequences have real impact in that they (i) will be with Mr. Gyasi for the rest of his life; and (ii) have a punitive and deterrent effect.

This Court, as have other district courts across the country, should recognize that these consequences are pertinent and support imposition of a sentence well below the guideline range. *See United States v. Wachowiak*, 412 F. Supp.2d 958, 963-964 (E.D. Wis. 2006) (imposition of a sentence significantly less than the guideline range in a child pornography case because "the guidelines failed to account for the significant collateral consequences defendant suffered as a result of his conviction. His future career as a teacher was ruined, and he was compelled to resign as a piano teacher of children…[and will be] forced to live with the stigma of being a convicted sex offender." *See also United States v. Stone*, 374 F. Supp. 2d 983 (D.N.M. 2005) (court sentenced defendant to 18 months below the guideline range noting his loss of employment and spouse as a result of the conviction. "The court concludes that a sixty month term of incarceration, coupled with Stone's personal losses, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment."); *United States v. Redeman*, 295 F. Supp. 2d 887, 897 (E.D. Wis. 2003) (downward departure in the pre-*Booker* era) (court cited all of the collateral consequences of defendant's conviction – including impact on his health, business, and reputation – and concluded that "the primary purposes of sentencing were partially achieved before the case was filed" and "[the collateral punishment] partially satisfied the need or just punishment" and

14

deterrence.

The Need for Incapacitation

There is no need to incapacitate Mr. Gyasi to prevent him from committing further crimes given his extremely low risk of recidivism. In support of that proposition, the Court should consider the following statistics and research:

1. According to the United States Sentencing Commission, offenders are less likely to recidivate when their sentence is probation as opposed to straight prison.[11]

2. For all Category I defendants convicted of fraud, the recidivism rate is 9.3%, the lowest of any offense category, which is 45% below the rate for all fraud offenders. *Id* at 30.

3. According to a study by the U.S. Sentencing Commission, a defendant who has zero criminal history points and no prior arrests at the time of sentencing has a 2.5% likelihood of re-offending. *See Recidivism and The First Offender*, U.S. Sentencing Commission, May 2004, p. 26, Ex. 6.[12]

4. Higher sentences do not result in greater deterrence. As it relates to discouraging future misconduct, there is a widespread misconception that the higher the sentence, the greater the effect in deterring others. However, the notion is nothing more than a myth, unsupported by empirical data. General research findings suggest that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and

---

[11]Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004). Available at: www.ussc.gov/publicat/Recidivism_general.pdf

[12] (Also available at http://www.ussc.gov/research.htm).

15

Justice:  A Review of Research, 28-29 (2006).

The most pertinent question for this Court is whether a term of imprisonment within the calculated advisory guidelines is necessary to serve this purpose, especially when considering studies which conclude that it is the certainty and promptness of punishment - rather than its severity - that lends the more powerful deterrent effect.  *Id*.

Statistically speaking, Mr. Gyasi is significantly less likely to reoffend; rendering a lengthy term of imprisonment unnecessary.

Similarly, there is no need to incapacitate Mr. Gyasi to protect the public.  Mr. Gyasi is a first-time offender with no prior arrests or convictions.  The instant offense is of a non-violent nature.  It has now been four (4) years since the offense and Mr. Gyasi has not engaged in any further unlawful conduct thus demonstrating he poses no ongoing risk to the public.  This factor weighs strongly in favor of a non-incarceratory disposition.

### D. The Need to Provide Restitution

In determining an appropriate sentence, this Court must consider the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(7).  The government has drafted a proposed restitution order in the amount of $850,000.  Mr. Gyasi agrees that the initial loss to the victim was $850,000.  However, *after* the bank (JPM Chase) was alerted that there was fraudulent activity on the account, the bank placed a freeze on Mr. Gyasi's account, and $87,898.29 was subsequently removed.  Counsel believes the $87,898.29 should be applied as a credit offsetting the restitution balance owed.[13]  As such, the proposed order has not yet been endorsed.  Mr. Gyasi

---

[13] Defense counsel has alerted the government and requested that it follow-up with bank officials or other involved officials to determine the status and location of those funds.  The government indicated that it had no information at the time.

is prepared to sign an agreed Restitution Order once this final matter is resolved.

Mr. Gyasi has worked throughout his adult life. His proven work history is indicative of someone who is prepared to maintain, and if necessary, obtain additional employment to repay the restitution owed in this case. Mr. Gyasi is starkly aware that the obligation to pay full restitution is solely his, and though a daunting task, he recognizes it as a meaningful step towards making amends. He requests that the Court impose a non-incarceratory sentence in part, so that he can maintain employment and make payments toward his restitution. It is not an abuse of discretion for the Court to consider Mr. Gyasi's ability to make restitution payments in imposing a below-guideline sentence. *See United States v.Meryweather*, 431 F.3d 692, 702 (9th Cir. 2005) (in an embezzlement case with loss of $500,000, no abuse found where court departed and imposed probation in part because "a sentence of probation may have made defendant better able to provide restitution."); *United States v. Peterson*, 363 F.Supp. 2d 1060 (E.D. Wis. 2005)(defendant convicted of defrauding bank of $80,000 sentenced to 1 day in prison and 5 years supervised release in part so defendant would not lose his job and could pay restitution).

If the Court determines that some term of imprisonment is necessary, Mr. Gyasi asks the Court to consider a greater term of home confinement with permission to work.

### E. The Kinds of Sentences Available

As this Court is aware, it must consider all the "kinds of sentences available" by statute, 18 U.S.C. § 3553(a)(3), even if the "kinds of sentences…established [by] the guidelines" recommend only a lengthy term of imprisonment.[14] In this case, a lengthy period of home confinement, and – if the Court deems necessary – a modest term of imprisonment, coupled with

---

[14] *Gall v. United States*, 128 S.Ct. 586, 602 (2007).

full payment of restitution sufficiently reflects (1) the nature and circumstances of the offense, (2) the history and characteristics of Mr. Gyasi, and (3) the need to provide just punishment. Moreover, the requested sentence recognizes Mr. Gyasi's reduced likelihood of recidivism and the lack of ongoing risk of danger to the public.

F. *Mr. Gyasi's Unopposed Request to Self-Surrender to his Designated BOP Facility (if applicable)*

Mr. Gyasi was released on pretrial supervision in July of 2025. His compliance with the conditions of his pretrial release has been a positive start in demonstrating his trustworthiness. If ordered to serve a term of imprisonment, counsel asks that Mr. Gyasi be allowed to self-surrender to his designated BOP facility.[15] Mr. Gyasi values his freedom and with the looming threat of incarceration, will not do anything to jeopardize his liberty now or upon her release from BOP after serving his sentence.

**Conclusion**

Mr. Gyasi is deeply remorseful for his actions and the embarrassment he has brought upon his family. He asks the Court for mercy and the opportunity to make amends by repaying the victim and showing the Court that he has learned from this enormous lapse in judgment. For this reason and those previously stated, Mr. Gyasi respectfully requests that this Court sentence him to a period of home confinement, and if the Court determines if necessary – a modest term of imprisonment in the BOP, and a 3-year term of supervised release.

Given Mr. Gyasi's restitution obligation and limited financial resources, he asks that no

---

[15] By granting self-surrender, Mr. Gyasi will be able to attend to necessary matters that he was not able to resolve in advance (i.e., terminating his lease, distributing, donating, or storing his furnishings, relinquishing his apartment, and possibly helping his father identify and secure housing that offers assistance to its residence).

monetary fine be imposed.

<div style="margin-left: 45%;">

Respectfully Submitted,
EMMANUEL AGYEI GYASI

</div>

By:     _____/s/_____

Counsel
Valencia Roberts, Esquire
Assistant Federal Public Defender
VSB No. 44999
Counsel for Emmanuel Gyasi
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0870
(703) 600-0880 (fax)
valencia_roberts@fd.org